IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CHU VUE,<br><br>            Petitioner,<br><br>    vs.<br><br>ROSEMARY NDOH, Warden, Avenal State Prison,[1]<br><br>            Respondent. | No. 2:18-cv-00123-JKS<br><br>MEMORANDUM DECISION |

Chu Vue, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254.  Vue is in the custody of the California Department of Corrections and Rehabilitation and incarcerated at Avenal State Prison.  Respondent has answered, and Vue has not replied.

## I.  BACKGROUND/PRIOR PROCEEDINGS

On April 15, 2010, Chu Vue was charged with accessory to a felony (Count 1), knowingly and without permission accessing a computer system in order to wrongfully obtain data (Count 2), and the murder of Steve Lo (Count 3), after he engaged the services of his brothers, Chong and Gary Vue, to kill his wife's lover.[2]  The information further alleged that the murder was committed with a lying in wait special circumstance and that a principal in the murder was armed with a firearm.  Chu pled not guilty to the charges, denied the allegations, and

---

[1]        Rosemary Ndoh, Warden, Avenal State Prison, is substituted for Stu Sherman, former Warden, California State Prison-Corcoran.  FED. R. CIV. P. 25(c).

[2]        Because the petitioner and his brothers share the same last name, this opinion, like the opinion of the California Court of Appeal, refers to the Vue brothers by their first names.

proceeded to a jury trial.  On direct appeal of his conviction, the California Court of Appeal laid

out the following facts underlying the charges against Chu:

### Chu's Motive for the Murder

Chu and Chia married in a traditional Hmong ceremony in 1987.  In 2008, Chu worked for the Sacramento County Sheriff's Department as a correctional officer at the Rio Cosumnes Correctional Center (RCCC).  Chia worked as a medical assistant at the California Medical Facility (CMF), a correctional institution run by the Department of Corrections and Rehabilitation.

In the summer of 2008, Chu began to suspect Chia of adultery.  His suspicions were based on an unfamiliar phone number that repeatedly appeared on the phone bill.  He was right about the affair.  For the previous year, Chia had been involved intimately with Steve Lo, a correctional officer who worked with her at CMF.  When Chu confronted Chia with his suspicions at the end of July, she admitted the affair, but did not reveal her lover's identity.  She did, however, acknowledge his name began with an "S" when Chu pressed her for a name and asked who was entered in her cell phone contacts list as "SOLO."  About a week later, Chu also found pictures on Chia's cell phone of her and Lo having sex.[FN4]

> FN4.   Chu was also having an affair with another woman, Mary Cha.

The following month, Chu employed various means to learn the identity of his wife's lover, some of which were lawful.  For instance, Chu used an online record gathering resource to do reverse phone number searches.  He also asked one of Chia's co-workers for the names of Hmong employees working at CMF, who revealed three potential last names: Xiong, Lo, and Yang.  Other methods were unlawful.  For example, after apparently seeing Chia and Lo together in the 24–Hour Fitness parking lot, a place they occasionally met, Chu called a friend who also worked for the sheriff's department and asked him to run a search of a license plate number through the department's computer system, claiming the driver of the vehicle with that license plate tried to "run him over" in the parking lot.  The deputy informed Chu the owner of the vehicle associated with that license plate was "Steve Lo."  Chu also asked his supervisor at RCCC for permission to use the sheriff's department computer record system to search for "someone."  The supervisor did not ask whom Chu wanted to check using the system, but explained it would be illegal to do so unless there was a valid law enforcement purpose and advised Chu not to do "anything stupid."  Notwithstanding this warning, Chu used sheriff's department computers on at least five occasions to search for "Steve Lo" and other variations of Lo's name, including "Xay," which was Lo's middle name.   The search results for "Xay Lo" revealed Lo's address in Elk Grove.

Chia filed for divorce in September 2008.  Lo was murdered at his home the following month.  When Chu first learned his wife was having an affair, he was "depressed" and "angry about the situation."  He also lost weight, "[a]t least ten pounds." However, closer to the time of the murder, his attitude changed, "he wasn't mad

anymore." On the subject of the affair, Chu told a friend at the sheriff's department: "People who do bad things eventually karma catches up with them."

### Chong and Gary's Motive for Participating in the Murder

In 2001, Chong and Gary were involved in a drive-by shooting in Minnesota. Chong was the driver; Gary, seated in the passenger seat, fired multiple shots into the driver's side of another vehicle, killing the driver of that vehicle.[FN5]

> FN5.   The separate juries heard this information from different witnesses. Both juries heard testimony from the patrol officer who responded to the scene of the drive-by shooting. Gary's jury learned about his role as the shooter and Chong's role as the driver from Gary's videotaped confession. Chong's jury learned about their respective roles from Chong's statement to his former wife, Neng Vang.

In 2004, Gary moved to California. He stayed at various places, including a house in Sacramento owned by his brother, Chu. In March 2006, law enforcement officers from Minnesota executed a search warrant at this house with the assistance of the Sacramento County Sheriff's Department. Gary was home at the time and agreed to accompany a detective to the station, where he was questioned about the 2001 drive-by shooting and admitted being the shooter. After the interview, Gary was returned to the house. Chu was there when Gary was returned. The detective told Chu to inform the sheriff's department if Gary left the house. Chu did not do so. When deputies came back less than an hour later, Gary was gone.[FN6] The following day, warrants were issued by the State of Minnesota for the arrest of Gary and Chong. The same month, Chong learned he was wanted for the 2001 murder and left Minnesota for California. Chong's wife, Neng, after speaking to Chu on the phone, facilitated Chong's escape from Minnesota by taking her brother's car and giving it to Chong, along with a prepaid cell phone and about $900 in cash.

> FN6.   As mentioned, only Gary's jury heard his confession. Chong's jury received a stipulation that the house was searched, law enforcement made contact with Gary during the search, Gary was interviewed and returned to the house, Chu was present when Gary returned and was told to notify the sheriff's department if Gary should leave. Gary then left without Chu informing the department.

In January 2007, Chu began looking for a rural property to use as a hideout for his fugitive brothers. Two months earlier, Gary and Chong were mentioned in an episode of the Fox Television network program "America's Most Wanted, " season 20, episode 5, that was broadcast November 4, 2006, during prime time viewing hours in California and Minnesota. (http://www.tv.com/shows/americas-most-wanted/november-4-2006-944154/, retrieved Jan. 27, 2016.) A picture of Gary was displayed while the episode's narrator stated:

"Cops in Minnesota say Gary Vue murdered a man.  Gary Vue may be hiding with his brother Chong."  Chu began the search for the hideout location by calling a real estate agent in Tehama County.  He identified himself as John Vue and said he worked for the Sacramento County Sheriff's Department.  After viewing two or three properties, Chu settled on a piece of land on Troutbrook Road in Corning.  He first said he wanted the property for himself, but then said he was buying the property for a family member.

Chu purchased the Corning property on behalf of Khou Vue, obtaining a loan in her name to finance the purchase in April 2007.  Khou was not related to Chu, but shares his last name due to their common Hmong clan.  As Khou explained the transaction, Chu told her he wanted to buy the property for "business," although he did not explain what that business was, and said he would take care of the money and the paperwork if she agreed to have the property title in her name.  She agreed because Chu was "very well respected" in the Hmong community, their families were "from the same clan and . . . know each other very well," and clan members are "supposed to help each other."  After buying the property, Chu also bought a mobile home and hired various contractors to grade the property, move and set up the mobile home, drill a well, and put in a septic system and utilities.  Chu also spoke to the Tehama County building inspector on three occasions during the spring or early summer of 2007.  During these conversations, Chu used his actual name and told the inspector "he used to be a deputy sheriff."  He also said the property belonged to "his sister," for whom he was "fixing it up."

Thereafter, Chong and Gary began living in the mobile home on the Corning property.  Their respective significant others visited them there in November 2007 to celebrate Thanksgiving.  Chong's wife also visited him at the mobile home on two or three additional occasions in 2008; Gary was present each time she was there.  Their sister, Allyssa, visited the property in September 2008.  While Chong and Gary were not there at the time, Allyssa suspected they were staying in the mobile home because of the presence of men's clothes she believed belonged to her brothers and the smell of the cologne they wore.  Allyssa also dropped off food at the mobile home at Chu's request.

### The Planning Phase

During the month leading up to Lo's murder, Chu and his fugitive brothers conducted surveillance on Lo's residence, using various rented vehicles, and one purchased using a false name, to drive past Lo's house.  They communicated using prepaid cell phones during their operations.  Somewhat ironically, a surveillance camera used by one of Lo's neighbors captured their efforts on video.  Because Chong's jury received no direct evidence that Chu engaged him and Gary to kill Lo on his behalf, we provide a fairly detailed account of the circumstantial evidence connecting each brother to these surveillance activities.[FN7]

> FN7.   Gary confessed to having murdered Lo with his brother Chong at Chu's request.  He confessed to his girlfriend, Kalue Vang, who related his confession to his jury, which we describe in greater detail at the end of our factual recitation.

On September 16, 2008, four days after Chia filed for divorce, Chu took a cash advance from one of his credit cards in the amount of $4,000 that he deposited into his checking account. The same day, he withdrew $3,500 in cash from that account. Later in the day, a green pickup truck was caught on surveillance video driving past Lo's house. While the video footage was not clear enough to make a definitive identification, the truck on the video appeared to match Chu's green pickup.

On September 19, Lang Vue rented a room at the Ramada Inn near Richards Boulevard in Sacramento. (Like Khou, Lang shares defendants' last name due to their membership in the same Hmong clan. Lang was also one of Gary's friends.) The occupants of the room stayed for two nights. That the room was rented for Chong and Gary at Chu's direction is supported by the following. Lang and Chu spoke on the phone using their registered cell phones the same day Lang rented the room. The room was paid for with cash at a time Lang was not doing well financially. Chu, however, withdrew a large sum of money from his checking account three days earlier. The day the room was rented, a prepaid cell phone being used by Chong and Gary also connected to a prepaid cell phone being used by Chu, who was at work at the time.[FN8] During the call, Chu's phone's signal was transmitted by (pinged) a cell tower close to RCCC while the phone being used by Chong and Gary pinged a cell tower close to the Ramada Inn. Prior to this date, that phone pinged cell towers in the Corning area, where their hideout was located. The following morning, when Chu got off work, he again used his prepaid phone to call Chong and Gary, and again Chu's phone pinged the cell tower close to RCCC while the phone being used by Chong and Gary pinged the cell tower close to the Ramada Inn. However, about half an hour later, there was another call between these phones, during which both phones pinged the cell tower close to the Ramada Inn, indicating Chu had driven there after his work shift.

> FN8.   An analysis of various cell phone records indicated Chong and Gary were using a prepaid cell phone with a number ending in 2743 until October 7, 2008, at which point they began using a prepaid cell phone with a number ending in 6821. These records also indicated Chu was using a prepaid cell phone with a number ending in 4429, as well as a cell phone registered to his sister, Allyssa, with a number ending in 8972. He used this latter phone primarily to call his girlfriend, Cha. Chong and Gary also used separate prepaid cell phones, with numbers ending in 7295 and 1542, respectively, which they used primarily to speak with their significant others. Lang used three prepaid cell phones, with numbers ending in 4276, 2147, and 0429.

On September 21, the day Chong and Gary checked out of the Ramada Inn, Lang rented a room at the Motel 6 off of Stockton Boulevard in south Sacramento. The room was rented for four nights and was again paid with cash. The first night, a vehicle similar to Chu's green pickup was caught on surveillance video driving past Lo's house. As the truck drove past the house, Chu used his prepaid cell phone to call Chong and Gary.

Chu's phone pinged the cell tower close to Lo's house and the phone being used by Chong and Gary pinged the cell tower close to the Motel 6.

Later that night, after Chu went to work, Lang rented a dark blue Ford Explorer from Avis. At the time the Explorer was being picked up, Chu used his prepaid cell phone to call Chong and Gary. Chu's phone pinged the cell tower close to RCCC. The phone being used by Chong and Gary pinged the cell tower close to the Avis rental location. Chu called Chong and Gary twice more that night, at roughly one-hour intervals. During the second of these calls, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. About four minutes after this second call was made, an SUV similar to the rented Explorer drove past Lo's house. About half an hour later, shortly after midnight on September 22, an SUV similar to the rented Explorer again drove past Lo's house. Four minutes after that, the phone being used by Chong and Gary again pinged the cell tower near Lo's house. Later in the morning, this phone was again pinging the cell tower close to the Motel 6 where Lang rented the room. That afternoon, Chu again used his prepaid cell phone to call Chong and Gary. The phone being used by Chong and Gary pinged the cell tower close to Lo's house. Five minutes later, an SUV similar to the rented Explorer drove past Lo's house. Later that night, the surveillance video captured a similar SUV driving past Lo's house six times. During one of these occasions, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. Just before midnight, that phone was again pinging the cell tower close to the Motel 6.

On September 23, Chu took an $8,000 advance from one of his credit cards and deposited that amount into his checking account. The following day, a truck similar to Chu's green pickup drove past Lo's house three times in less than a two-hour period. During this same period of time, within one minute of two of the drive-bys, Chu used his prepaid cell phone to call Chong and Gary. Chu's phone pinged the cell tower close to Lo's house. The phone being used by Chong and Gary pinged the cell tower close to the Motel 6. During the third drive-by, the surveillance video shows the driver of the truck wearing what appears to be a black short-sleeved shirt. About two hours later, Chu entered his bank wearing a black short-sleeved shirt. At the bank, Chu closed his checking account, withdrawing $10,675.96 in the form of a cashier's check. About an hour later, Chu opened a checking account at a different bank, depositing $10,090.96 into that account, renting a safety deposit box for $85, and depositing the remaining $500 into a separate account.

On September 25, the day Chong and Gary checked out of the Motel 6 in south Sacramento, Lang rented a room at a different Motel 6, near the Ramada Inn where they had previously stayed. The room was rented for two nights and paid with cash. Also on this date, around noon, Lang returned the Explorer to Avis and exchanged it for a silver Chevy TrailBlazer. About three hours later, an SUV similar to this rented TrailBlazer drove past Lo's house. Six minutes after that, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. About half an hour later, an SUV similar to the rented TrailBlazer again drove past Lo's house. Less than an hour and a half after that, the phone being used by Chong and Gary again pinged the cell tower close to Lo's

6

house. Later that night, an SUV similar to the rented TrailBlazer drove past Lo's house five more times.

The following morning, September 26, an SUV similar to the rented TrailBlazer again drove past Lo's house. That night, Lang returned the silver TrailBlazer to Avis and exchanged it for a blue TrailBlazer. Around this time, Chu used his prepaid cell phone to call Chong and Gary. The phone being used by Chong and Gary pinged the cell tower close to the Avis rental location. About an hour later, an SUV similar to the newly-rented TrailBlazer drove past Lo's house. Later that night, the phone being used by Chong and Gary pinged the cell tower close to Lo's house. Chong and Gary checked out of the Motel 6 the following day. The day after that, an SUV similar to the rented blue TrailBlazer drove past Lo's house three more times. By the early morning hours of September 29, the phone being used by Chong and Gary was again pinging cell towers close to their hideout in Corning. Lang returned the blue TrailBlazer to Avis later in the day.

On October 2, Allyssa rented a room at the Motel 6 off of Richards Boulevard. She did so because Chu called and asked her to rent the room for Chong and Gary. When she arrived at the motel, Chong and Gary were waiting for her in the parking lot. They each had a backpack. The following day, Lang rented another SUV from a different Avis rental location. Initially given a red Chevy Traverse with Texas license plates, he returned a few minutes later and exchanged this vehicle for a gray Dodge Nitro with California plates. When Lang returned to exchange the vehicle, he had two individuals with him. Chong and Gary checked out of the Motel 6 on October 4. That morning, their prepaid cell phone pinged the cell tower close to the Motel 6 three times. Later in the afternoon, it twice pinged the cell tower close to Lo's house. The following night, their cell phone again pinged a cell tower in the Corning area. During the early morning hours of October 6, a truck similar to Chu's green pickup drove past Lo's house. Three minutes later, Chu's registered cell phone pinged the cell tower close to Lo's house. About two hours after that, an SUV similar to the rented Nitro drove past Lo's house. Later in the morning, Chu withdrew $3,000 from his checking account. That afternoon, Lang returned the Nitro to Avis. About an hour and a half after the Nitro was returned, Chu used his prepaid cell phone to call Chong and Gary, whose phone pinged the cell tower close to Lo's house.

On October 7, Chu bought a black 2000 Chevy Blazer from Alberto Alvarez for between $2,000 and $2,500. He paid for the SUV with cash and used the name "James Saehorn" when filling out the release of liability form. Alvarez testified he received at least two phone calls that day from a man who wanted to look at the vehicle. Two Asian men showed up at the time and place agreed upon. One of the men was Lang. However, the other man did the bargaining, paid for the Blazer with cash, and filled out the paperwork, while Lang was mostly quiet. While Alvarez could not identify Chu as the person who bought the SUV, phone records indicate Chu was the one who made the calls to Alvarez about looking at the vehicle. Also on October 7, two prepaid cell phones were purchased. One was subsequently used by Lang, while the other was subsequently used by Chong and Gary. On two occasions that night, the new prepaid cell phone being used by Chong and Gary pinged the cell tower close to Lo's house.

On October 8, during the morning, Chu withdrew $1,500 from his checking account and also accessed his safety deposit box.  Twice that afternoon, about half an hour apart, Chu's prepaid cell phone connected to the new phone being used by Chong and Gary.  This new phone pinged the cell tower close to Lang's house, while Chu's phone pinged the cell tower close to Lo's house.  There is no indication anyone rented a motel room for Chong and Gary on this day.  The following afternoon, Chu used his prepaid cell phone to again call Chong and Gary.  This time, the phone being used by Chong and Gary pinged the cell tower close to Lo's house.  Later that night, during two calls made to different numbers, their phone again pinged the cell tower close to Lo's house.  Two or three minutes after the second call, an SUV similar to the newly-purchased Blazer drove past Lo's house.  Less than half an hour after that, their phone again pinged the same cell tower.  Between October 10 and October 13, their phone pinged that same cell tower six more times.  On two other occasions, the phones being used by Chong and Gary to communicate with their significant others also pinged this cell tower.

On October 14, the day before the murder, Chu withdrew $2,000 from his checking account.  He worked that night at RCCC.  His shift started at 7:00 p.m. and ended at 7:00 a.m. the following day.  By the time Chu got off of work, Lo was dead.  Correctional officers working with Chu that night testified he was "on the phone a lot," about "five, six or seven times," having "[l]engthy" conversations in a language other than English, and using two separate cell phones.  These accounts are corroborated by the phone records.  Between the start of Chu's shift and midnight, his prepaid cell phone called the phone being used by Chong and Gary 10 times.  Chu also used a separate cell phone, the one registered to his sister, to talk to his girlfriend for over 90 minutes.

***The Murder***

Lo was murdered as he opened his garage door to leave for work a few minutes before 5:00 a.m. on October 15.  His wife, who was studying in the family room at the time, heard "commotions" coming from the garage and ran to check on her husband.  When she got to the garage, the garage door was "wide open" and her husband was lying on the ground with his head propped against one of the walls.  He had been shot in the forehead.  Afraid whoever shot her husband "might still be out there," Lo's wife closed the garage door.  She then called 911 and pulled her husband flat on the garage floor to check for other injuries.  Police officers and emergency medical personnel arrived a short time later.  When they arrived, Lo had blood coming from his nose and pooled beneath his head.  He was still breathing, but was unresponsive.  Lo was later pronounced dead at University of California at Davis Medical Center.

A subsequent autopsy revealed the fatal gunshot wound had gunpowder stippling, indicating the gun had been fired from a range of several inches to a few feet from Lo's head.  There was also a rectangular abrasion, which contained a laceration, on top of his head and defensive wounds on his right hand.  The abrasion was consistent with Lo having been "pistol whipped" prior to the fatal shot being fired.  A subsequent analysis of the crime scene revealed a second bullet had been fired that missed Lo and lodged in a cabinet in the garage.  The bullets recovered from Lo's body and the cabinet were both

"nominal 38 caliber" bullets, but each was fired from a separate gun.  An expended 9–millimeter shell casing that could have contained either bullet was also recovered from the floor of the garage.

Returning to the activities of Chu and his brothers, about five hours before the murder, shortly after midnight, and less than half an hour after Chu's tenth phone call to the phone being used by Chong and Gary, an SUV similar to the black Blazer purchased by Chu eight days earlier drove past Lo's house.  Chu again called Chong and Gary at 4:29 a.m., and again at 4:33 a.m.  During each call, the phone being used by Chong and Gary pinged the cell tower close to Lang's house.  At 4:46 a.m., there was another drive-by of Lo's house by an SUV similar to the black Blazer purchased by Chu.  Between 4:46 a.m. and 5:18 a.m., Chu used his registered cell phone to call Chia's cell phone seven times.  Lo was murdered during this barrage of calls.

### The Aftermath

About half an hour after the murder, Chu again used his prepaid cell phone to call Chong and Gary.  The phone being used by Chong and Gary again pinged the cell tower close to Lang's house.  Chu left work shortly after this call was made.  Less than two hours later, Chu used his prepaid cell phone to call Chong and Gary three more times.  Their phone was still pinging the cell tower close to Lang's house.  About two hours later, Allyssa terminated service for the cell phone Chu had been using primarily to call his girlfriend.  About an hour after that, Chu accessed his safety deposit box and then made another call to Chong and Gary.  Their phone was now pinging cell towers in the Corning area.  This was the last phone call made with Chu's prepaid cell phone.  Later in the afternoon, having stayed in the Corning area for at least two and a half hours, the prepaid phone being used by Chong and Gary again pinged the cell tower close to Lang's house.  At some point during the day of the murder, Chu also booked a one-way flight from Minneapolis to Sacramento for November 4.

The following day, October 16, Lang again rented a room at one of the Motel 6 locations previously used as a base of surveillance operations.  The room was rented for two nights and paid with cash.  The vehicle associated with the room rental had the same license plate number as the Blazer purchased by Chu.  Between October 19 and 20, Chong and Gary drove the Blazer from Sacramento to Minnesota.  Their cell phones tracked their movement, pinging cell towers in Utah and Iowa along Interstate Highway 80 before pinging a cell tower in the Minneapolis area on the evening of October 20.  When they returned to Minnesota, Chong and Gary met their significant others, Neng and Kalue, at a park in St. Paul.  They arrived in the same Blazer they drove across the country.  Gary was in possession of about $3,000 in cash.  Chong was also in possession of a "stack" of cash.  Thereafter, Neng and Kalue purchased new prepaid cell phones for their communications with Chong and Gary and threw their old phones away.  Chong and Gary spent eight or nine days in a motel room rented by Kalue with money given to her by Gary.  After that, they moved into an apartment in St. Paul, along with Kalue and her daughter, which Neng and her two children also visited. Kalue again secured the accommodations with money given to her by Gary.  At Chong's request, Neng facilitated transfer of the Blazer to Pag Moua, to whom she was secretly engaged.

In March 2009, the apartment where Chong and Gary were living was raided by Minnesota law enforcement officers and FBI agents. Chong and Gary were arrested. During a search of the apartment, officers found a black backpack containing a Taser, two black stocking caps, two pairs of black gloves, a flathead screwdriver, and a jar of black camouflage makeup. The following day, police recovered the Blazer previously transferred to Moua. Chu was arrested in Sacramento later the same month. Various searches conducted in California uncovered evidence connecting Chu to the aforementioned efforts to discover Lo's identity and surveillance activities. Fingerprints at the Corning property also confirmed Chong and Gary had been at that location.

*People v. Vue*, Nos. C066885, C069517, 2016 WL 347769, at *2-8 (Cal. Ct. App. Jan. 28, 2016).

Chong and Gary were tried together before separate juries. Chu was tried separately from his brothers. Each brother was convicted of first-degree murder with a lying in wait special circumstance found to be true. Chu's jury also found true the special allegation that a principal in the murder was armed with a firearm. Chu was also found guilty of harboring a principal in a felony (his fugitive brothers) and of unauthorized access to a computer system based on his use of the sheriff's department's computer system to obtain information about Lo. Each of the brothers were sentenced to a term of life imprisonment without the possibility of parole ("LWOP"). Chu was additionally sentenced to a determinate term of 4 years and 8 months.

Through counsel, Chu appealed his conviction, arguing that the trial court prejudicially erred and violated his constitutional rights by ordering him restrained in belly chains through most of the trial and requiring him to be chained to the witness stand while testifying. The Court of Appeal unanimously affirmed the judgment against Chu in a reasoned, unpublished opinion issued on January 18, 2016. *Vue*, 2016 WL 347769, at *20. The Court of Appeal "conclude[d] the trial court abused its discretion when it ordered Chu to be restrained during trial without a showing of manifest need. However, because there [wa]s no probability the result would have been different but for the restraints," the Court of Appeal declined to reverse Chu's adverse

judgment.  *Id.*  Chu petitioned for review in the California Supreme Court, which was summarily

denied on April 27, 2016.

Chu then filed a *pro se* petition for habeas relief in the California Supreme Court,

claiming that trial counsel was ineffective for failing to: 1) investigate whether a change of

venue was warranted; 2) object to a peremptory challenge of the only Asian female prospective

juror; 3) investigate the shooters to find some evidence that he did not solicit them to kill his

wife; and 4) appellate counsel was ineffective for failing to raise these issues on direct appeal.

The state habeas petition was denied with citation to *Dixon*[3] and *Duvall*[4] on December 13, 2017.

Docket No. 17-11.

On January 19, 2018, Chu timely filed in this Court a *pro se* submission indicating his

desire to file a federal habeas petition.  Docket No. 1; *see* 28 U.S.C. § 2244(d)(1),(2).  This

Court, through a previously-assigned magistrate judge, denied Chu's request for appointed

counsel but provided Chu the proper form for pursuing such relief.  Docket No. 7.  Chu filed a

*pro se* Amended Petition for a Writ of Habeas Corpus.  Docket No. 9 ("Petition").  Briefing is

now complete, and the case is before the undersigned judge for adjudication.

## II. GROUNDS/CLAIMS

---

[3]     *In re Dixon*, 264 P.2d 513, 514 (Cal. 1953) (holding that habeas relief is unavailable if "the claimed errors could have been, but were not, raised upon a timely appeal from a judgment of conviction").

[4]     *People v. Duvall*, 886 P.2d 1252, 1258 (Cal. 1995) (stating that habeas petitions "should both (i) state fully and with particularity the facts on which relief is sought as well as (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations" (citations omitted)).

In his *pro se* Petition before this Court, Chu argues that: 1) the trial court violated his constitutional rights by ordering him restrained in belly chains throughout most of the trial and requiring him to be chained to the witness stand while testifying; 2) trial counsel was ineffective for failing to investigate whether a change of venue was necessary; 3) trial counsel was ineffective for failing to object to the jury pool or a peremptory challenge of an Asian American juror; 4) trial counsel was ineffective for failing to investigate whether Chong and Gary may have killed Lo in "self-defense" during a "botched attempt to intimidate him for insulting the family clan;" 5) appellate counsel was ineffective for failing to raise the ineffective assistance of trial counsel claims on direct appeal; and 6) the imposed restitution fine was improper.

## III.  STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2).  A state-court decision is contrary to federal law if the state court applies a rule that contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives at a different result.  *Williams v. Taylor*, 529 U.S. 362, 406 (2000).  The term unreasonable is a common term in the legal world.  The Supreme Court has cautioned, however, that the range of reasonable judgments may depend in part on the nature of the relevant rule argued to be clearly established federal law.  *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating

whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1) "refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon the states; that is, the decision must be based upon constitutional grounds, not on the supervisory power of the Supreme Court over federal courts. *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'" *Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

To the extent that the Petition raises issues of the proper application of state law, they are beyond the purview of this Court in a federal habeas proceeding. *See Swarthout v. Cooke*, 131 S. Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was correctly applied).  It is a fundamental precept of dual federalism that the states possess primary authority for defining and enforcing the criminal law. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002).

In applying these standards on habeas review, this Court reviews the "last reasoned decision" by the state court. *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003).

Chu has not replied to Respondent's answer.  The relevant statute provides that "[t]he

allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a

habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the

judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v.

Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence

offered to contradict the allegations of the return, the court must accept those allegations as true.

*See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

## IV. DISCUSSION

1.    <u>Shackles Claim</u> (Ground 1)

Chu first argues, as he did on direct appeal, that he was unjustifiably shackled during

trial, which deprived him of his rights to due process and a fair trial.  The Court of Appeal laid

out the following facts underlying this claim:

> Most of the evidence adduced during the joint trial of Chong and Gary was also
> adduced during Chu's trial.  However, in Chu's trial, many facts were not disputed.  For
> example, Chu did not dispute using various means, including making unlawful use of
> sheriff's department computers, to learn Lo's identity and address after discovering the
> affair.  Chu also did not dispute protecting his fugitive brothers from the consequences of
> the prior Minnesota murder by, among other things, establishing their hideout in Corning.
> Nor did Chu dispute that Chong and Gary murdered Lo as he opened his garage door to
> leave for work on the morning of October 15, 2008.  The primary issue at Chu's trial was

14

whether he engaged them to do so, or whether they decided to murder Lo on their own, either because they saw Chia's infidelity as an insult to the entire family or because they feared Chia told Lo about their fugitive status. Chu's testimony at trial supported this latter theory.

With respect to the issue raised on appeal, prior to voir dire, Chu's trial counsel objected to Chu being restrained in belly chains during trial. Counsel pointed out Chu was a former deputy sheriff, had no prior criminal record, and had no disciplinary problems while in custody. Counsel further argued Chu was an escort officer at one point, knew how to behave in court, and was behaving properly. In response, the bailiff used "that exact argument as a counter argument," explaining Chu's extensive knowledge of the courthouse, his "specialized cop knowledge," his muscular build, and the fact he was facing a life sentence, justified the use of restraints. The bailiff did, however, acknowledge Chu had "no write-ups in regards to violence, and he had no problems with officers except for being a little mouthy on occasion." The trial court ruled Chu would be released from his belly chains during voir dire, and the issue would be revisited prior to the taking of evidence.

Apparently, the issue was revisited off the record prior to the taking of evidence. However, the only indication in the record as to the content of the trial court's ruling is the following statement made by the trial court prior to Chu's testimony: "[Chu's counsel] has raised a concern about the fact that [Chu] is on the stand now, and because of the security requirements which previously the Court addressed in an out-of-the-presence hearing and I made a number of rulings relative to security and restraints when [Chu] was in the courtroom consistent with those rulings, [Chu] is unable to stand at the—now the witness box. He's in the witness box presently, but when he's sworn he won't be able to stand. [¶] . . . [¶] There is a concern based upon the fact that [Chu] is healthy, able and strong and has a comprehensive knowledge of the floor plan and logistics of the courthouse, which is unusual for a defendant, that based upon those factors and others I concluded that it would be necessary and appropriate to have some restraints the level of which are represented now in [Chu] being chained at his seat in the witness box."

Chu's counsel then argued against Chu being so restrained during his testimony, explaining: "I believe the major reason that [Chu] is secured to the chair is because of his prior employment with the sheriff's department. [¶] Had [Chu] not been employed with the sheriff's department—I don't believe there are any write-ups, I don't believe he has been disruptive, he has no record—I think he would have been in the same boat as [co-defendant Lang], so I don't want the jurors to think that he's disrespecting them." Counsel then stated he would have "no problem" with the jury being informed that "because of [Chu's] past employment, because of his situation being charged with murder that he's secured to that chair, specifically . . . because of his knowledge that he knows the jail system and the court system, and because of that it's routine for him to be secured to the chair." Counsel continued: "And I think that's the only reason. I can't believe there is any other reason why he's chained to that chair other than . . . his knowledge and having worked at the Sacramento County Jail. I think that's the truth."

15

The trial court responded: "Well, [counsel], it's not at all unusual that a defendant in a homicide trial who is physically able and fit, as in particular as [Chu] is, would be chained if they take the stand. [¶] They're typically chained, as has been [Chu] at the counsel table and then when they take the stand, the same level of security is almost always maintained."

Chu's counsel then stated: "I'm not objecting to it, your Honor. [¶] I'm only saying that they might notice the difference that [Lang] wasn't chained to a chair." Counsel then suggested "as a compromise" that the trial court inform the jury Chu was ordered to "remain seated during the swearing . . . to minimize the fact that he's not going to stand up when he is sworn in." The trial court then reminded counsel other witnesses had been sworn outside the presence of the jury. Counsel agreed with that compromise: "No, actually, I think you're right. I forgot other witnesses were sworn outside the presence of the other jury, so go ahead and swear him in now and indicate he has been sworn." Chu was then sworn outside the presence of the jury, after which the jury entered the courtroom and was so informed.

*Vue*, 2016 WL 347769, at *16.

The Sixth and Fourteenth Amendments to the United States Constitution assure a criminal defendant the right to a fair trial. *See Estelle v. Williams*, 425 U.S. 501, 503 (1976). Visible shackling of a criminal defendant during trial "undermines the presumption of innocence and the related fairness of the factfinding process" and "'affront[s]' the 'dignity and decorum of judicial proceedings that the judge is seeking to uphold.'" *Deck v. Missouri*, 544 U.S. 622, 630-31 (2005) (*quoting Illinois v. Allen*, 397 U.S. 337, 344 (1970)); *see also Larson v. Palmateer*, 515 F.3d 1057, 1062 (9th Cir. 2008). The Supreme Court has therefore held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial." *Deck*, 544 U.S. at 629. Those interests include "physical security," "courtroom decorum" and "courtroom security." *Id.* at 624, 628. Accordingly, criminal defendants have "the right to be free of shackles and handcuffs in the presence of the jury, unless shackling is justified by an essential state interest." *Ghent v. Woodford*, 279 F.3d

16

1121, 1132 (9th Cir. 2002); *see also Jones v. Meyer*, 899 F.2d 883, 884 (9th Cir. 1990); *Wilson v. McCarthy*, 770 F.2d 1482, 1484 (9th Cir. 1985).

Nonetheless, shackling is not unconstitutionally prejudicial *per se*. *Allen*, 397 U.S. at 343-44; *Duckett v. Godinez*, 67 F.3d at 748 ("shackling is inherently prejudicial, but it is not per se unconstitutional"). Consequently, unjustified shackling does not rise to the level of constitutional error unless the defendant makes a showing that he suffered prejudice as a result. *Ghent*, 279 F.3d at 1132 (citations omitted); *see also Larson*, 515 F.3d at 1064 (finding harmless state trial court's violation of the petitioner's due process rights in requiring him to wear security leg brace during trial). The Ninth Circuit has held that "the greater the intensity of shackling and the chains' visibility to the jurors, the greater the extent of prejudice." *Spain v. Rushen*, 883 F.2d 712, 722 (9th Cir. 1989). Thus, it has been recognized that "physical restraints such as a waist chain, leg irons or handcuffs may create a more prejudicial appearance than more unobtrusive forms of restraint." *Larson*, 515 F.3d at 1064.

On direct appeal, Respondent conceded that the requisite showing of manifest need for shackling was not apparent from the record. The Court of Appeal nonetheless concluded that the error was harmless under California law:

> "The California Supreme Court has not ruled which harmless error standard applies when a court abuses its discretion and permits a defendant to be shackled in violation of Duran. Thus far, the question appears to turn on whether the jury is aware of the physical restraints. '[W]hen a trial court abuses its discretion in shackling a defendant, evidence establishing that the jury saw the restraints means that the error rises to the level of constitutional error to be tested under the *Chapman* test. (*Chapman v. California*, *supra*, 386 U.S. 18.) Thus, while a brief glimpse of defendant in shackles would not constitute prejudicial error [citations], the use of physical restraints in the courtroom without a prior showing of the manifest need for such restraints violates *Duran*. [Citation.] When such restraints are visible to the jury for a substantial length of time without meeting the *Duran* requirements, this trial court error may deprive defendant of his [or her] due process right to a fair and impartial jury, and may affect the

presumption of innocence.  [Citation.]  Accordingly, when such error occurs, it rises to the level of constitutional error.' [Citations.]" (*People v. Vance* (2006) 141 Cal.App.4th 1104, 1114–1115; *see also People v. Miller*, *supra*, 175 Cal.App.4th at p. 1115.) However, where the record does not demonstrate the jury saw the restraints, "the error is not constitutional error, and it should therefore be tested under the *Watson* test." (*People v. Jackson* (1993) 14 Cal.App.4th 1818, 1829.)

Here, there is no evidence the jury saw Chu's restraints.  Accordingly, we must determine whether there is a reasonable probability the result would have been different but for the restraints.  We conclude there is no such probability.  Indeed, our Supreme Court has "consistently found any unjustified or unadmonished shackling harmless where there was no evidence it was seen by the jury." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 583–584; *People v. Foster* (2010) 50 Cal.4th 1301, 1322; *see also People v. Anderson* (2001) 25 Cal.4th 543, 596.)  Chu disagrees, relying on *People v. Mar* (2002) 28 Cal.4th 1201 (*Mar*), in which our Supreme Court held the use of a stun belt as a restraint was subject to the same "manifest need" standard as more traditional forms of restraint (*id.* at pp. 1215–1220), and also held the use of a stun belt in that case was not supported by such a need and resulted in prejudice to the defendant therein (*id.* at pp. 1222–1225). With respect to prejudice, the court explained that "the evidence was not totally one-sided," the defendant's testimony "was not absurd or inherently implausible," and the jury's resolution of the case "turned completely on the jury's evaluation of the credibility of the witnesses, an evaluation that depended in large part upon the demeanor of each witness on the witness stand."  (*Id.* at p. 1224.)  The court continued: "From the cold record before us, it is, of course, impossible to determine with any degree of precision what effect the presence of the stun belt had on the substance of defendant's testimony or on his demeanor on the witness stand.  But defendant, in objecting to being required to testify while wearing the stun belt, clearly stated that the device made it difficult for him to think clearly and that it added significantly to his anxiety, and the trial transcript confirms that defendant was nervous while testifying at trial.  It is, of course, not unusual for a defendant, or any witness, to be nervous while testifying, but in view of the nature of a stun belt and the debilitating and humiliating consequences that such a belt can inflict, it is reasonable to believe that many if not most persons would experience an increase in anxiety if compelled to wear such a belt while testifying at trial." (*Ibid.*)  The court then concluded, "the relative closeness of the evidence, the crucial nature of defendant's demeanor while testifying, and the likelihood that the stun belt had at least some effect on defendant's demeanor while testifying" compelled the conclusion that the trial court's error in requiring the belt was prejudicial under the *Watson* standard. (*Id.* at p. 1225.)

This case is not *Mar*.  First, unlike *Mar*, *supra*, 28 Cal.4th 1201, a case in which the defendant was convicted of resisting a peace officer, and that turned entirely on the jury's assessment of the respective credibility of two competing witnesses, i.e., the defendant and the officer he allegedly resisted, here, there was strong circumstantial evidence connecting Chu to the murder admittedly committed by his brothers.  Indeed, as previously mentioned, Chu did not dispute much of this evidence.  He admitted using the sheriff's department computer system to discover Lo's identity and address after he

discovered the affair.  He admitted protecting Chong and Gary from the consequences of the prior Minnesota murder, including establishing their hideout in Corning.  He admitted driving past Lo's house on multiple occasions during the month leading up to the murder, and further admitted using a prepaid cell phone to communicate with Chong, who was also using a prepaid cell phone, during this time. He also admitted calling Alvarez about the Blazer he was selling, although he claimed the vehicle was purchased by Chong and Gary for their trip back to Minnesota and denied giving them money to buy the SUV. Nor did Chu dispute Chong and Gary murdered Lo, or they engaged in the surveillance operations established by their phone records, motel records, rental car records, and the video surveillance footage obtained from Lo's neighbor.  Chu's defense was based on his claim he was unaware his brothers were engaging in these activities or that they planned to murder Lo.  However, while Chu's self-serving testimony in this regard was not "inherently implausible" (*Mar*, *supra*, 28 Cal.4th at p. 1224), neither was it believable in light of the foregoing undisputed evidence and other strong circumstantial evidence Chu was at the center of the plot to murder his wife's lover.

Second, the prejudice analysis in Mar turned on the psychological effects a stun belt, which delivers a "debilitating electric shock when activated by a transmitter controlled by a court security officer," and which, "in a troubling number of instances . . . has activated accidentally" (*Mar*, *supra*, 28 Cal.4th at pp. 1204–1205), could have had on the testifying defendant.  (*Id.* at pp. 1224–1225.)  The court was careful to point out: "*Unlike shackles and manacles, which have been used for hundreds of years and whose operation is predictable and effects well known*, the stun belt is a relatively new device with unique attributes and whose use has not been without problems or controversy.  In light of the nature of the device and its effect upon the wearer when activated, requiring an unwilling defendant to wear a stun belt during trial may have significant psychological consequences that may impair a defendant's capacity to concentrate on the events of the trial, interfere with the defendant's ability to assist his or her counsel, and adversely affect his or her demeanor in the presence of the jury." (*Id.* at p. 1205, italics added.) This case does not involve the use of a stun belt.  And while traditional restraints have also been described as "tend[ing] to confuse and embarrass [a defendant's] mental faculties" (*People v. Harrington* (1871) 42 Cal. 165, 168), as we have already observed, their use has routinely been held to be harmless where there is no evidence the jury saw them. (*People v. Foster*, *supra*, 50 Cal.4th at p. 1322; *People v. Tuilaepa*, *supra*, 4 Cal.4th at pp. 583–584.)

We conclude the trial court abused its discretion when it ordered Chu to be restrained during trial without a showing of manifest need.  However, because there is no reasonable probability the result would have been different but for the restraints, we cannot reverse the judgment.

*Vue*, 2016 WL 347769, at *17-20.

The Court of Appeal's harmlessness determination is both reasonable and fully supported by the record, which does not reflect that the jury saw the shackles.  Accordingly, the Court of

Appeal's decision does not contravene or unreasonably apply federal law.  *See Williams v. Woodford*, 384 F.3d 567, 592 (9th Cir. 2004) ("Even if we assume that Williams's physical restraints at trial were unjustified, we conclude that the district court properly held that the error was harmless.  When the jury never saw the defendant's shackles in the courtroom, we have held that the shackles did not prejudice the defendant's right to a fair trial."); *see also Castillo v. Stainer*, 983 F.2d 145, 149 (9th Cir. 1992) (a waist chain that could not be seen by the jury was harmless error).  Chu is thus not entitled to relief on this ground.

2.      <u>Ineffective Assistance of Counsel Claims</u> (Grounds 2-5)

Chu next alleges that counsel was ineffective for a variety of reasons.  To demonstrate ineffective assistance of counsel under *Strickland v. Washington*, a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced his defense.  466 U.S. 668, 687 (1984).  A deficient performance is one in which "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment."  *Id.*

The Supreme Court has explained that, if there is a reasonable probability that the outcome might have been different as a result of a legal error, the defendant has established prejudice and is entitled to relief.  *Lafler v. Cooper*, 132 S. Ct. 1376, 1385-86 (2012); *Glover v. United States*, 531 U.S. 198, 203-04 (2001); *Williams*, 529 U.S. at 393-95.  Where a habeas petition governed by AEDPA alleges ineffective assistance of counsel, the *Strickland* prejudice standard is applied and federal courts do not engage in a separate analysis applying the *Brecht* harmlessness standard.  *Avila v. Galaza*, 297 F.3d 911, 918, n.7 (9th Cir. 2002); *see also Musalin*

*v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009).  Under this rubric, in reviewing ineffective

assistance of counsel claims in a federal habeas proceeding:

> The question "is not whether a federal court believes the state court's
> determination" under the *Strickland* standard "was incorrect but whether that
> determination was unreasonable—a substantially higher threshold."  And, because the
> *Strickland* standard is a general standard, a state court has even more latitude to
> reasonably determine that a defendant has not satisfied that standard.

*Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (citations omitted); *see also Runningeagle v.*

*Ryan*, 686 F.3d 758, 775 (9th Cir. 2012).

Thus, Chu must show that his trial counsel's representation was not within the range of

competence demanded of attorneys in criminal cases, and there is a reasonable probability that,

but for counsel's ineffectiveness, the result would have been different.  *See Hill v. Lockhart,* 474

U.S. 52, 57 (1985).  An ineffective assistance of counsel claim should be denied if the petitioner

fails to make a sufficient showing under either of the *Strickland* prongs.  *See Strickland*, 466

U.S. at 697 (courts may consider either prong of the test first and need not address both prongs if

the defendant fails on one).

Chu fails to satisfy these heavy burdens with respect to any of his challenges.  Chu first

faults counsel for failing to request a change of venue.  Chu raised this claim in his habeas

petition filed in the California Supreme Court, and the Supreme Court denied it for failure to

provide documentary evidence.  Chu does not provide the necessary evidence here either.  This

lack of evidentiary support is fatal to his claim.  *Woodford v. Visciotti*, 537 U.S. 19, 15 (2002)

(*per curiam*) (holding that state habeas petitioner carries the burden of proof).

As discussed above, to prevail on an ineffective assistance claim, a petitioner must show

both that counsel's performance was deficient and that counsel's performance prejudiced his

defense.  *Strickland*, 466 U.S. at 687.  In order to show prejudice for failing to file a motion, a petitioner must show that (1) had counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to the petitioner.  *Wilson v. Henry*, 185 F.3d 986, 990 (9th Cir. 1999) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 373-74 (1986)).  A determination of whether defense counsel was ineffective in presenting the motion for change of venue requires consideration of the merits of the motion.  Because Chu does not cite to the record or otherwise present support for any contention that, due to negative publicity, he could not receive a fair trial in his community, he fails to show that counsel was ineffective for failing to request a venue change or that he was prejudiced by the inaction.

Likewise, Chu fails to establish that counsel was ineffective for failing to object to the overall jury composition and its lack of Asian Americans.  Although a petit jury "must be drawn from a source fairly representative of the community," a criminal defendant is "not entitled to a jury of any particular composition."  *Taylor v. Louisiana*, 419 U.S. 522, 538 (1975); *see also Powers v. Ohio*, 499 U.S. 400, 404 (1991) (although a criminal defendant has the right to be tried by a jury whose members are selected by non-discriminatory criteria, a defendant does not have a right to a right to a petit jury composed in whole or part of persons of the same race).  The Constitution only requires that "the jury wheels, pools of names, panels, or venires from which juries are drawn must not systematically exclude distinctive groups in the community and thereby fail to be reasonably representative thereof."  *Taylor*, 419 U.S. at 538.  In order to prevail on this claim, Chu would have to demonstrate that the manner of selecting the jury panels systematically excluded distinctive groups such that counsel should have objected to it.  *See id*.

22

Here, Chu has not pointed to any evidence of systematic exclusion of Asian Americans from the jury pool and  fails to allege any factual basis for concluding that his trial jury was anything but impartial.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (the Sixth Amendment guarantees criminal defendants the right to a "fair trial by a panel of impartial, 'indifferent' jurors").  Petitioner's bare and conclusory allegation to the contrary does not come close to satisfying the *Strickland* standard and is manifestly insufficient to warrant habeas corpus relief.  *Jones v. Gomez*, 66 F.3d 199, 204–05 & n. 1 (9th Cir. 1995); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994).

The same is true for Chu's contention that counsel should have raised a *Batson*[5] challenge to the prosecution's peremptory challenge of an Asian-American prospective juror.  Chu alleges that the prospective juror "may have had a reasonable understanding of the esoteric workings of the Hmong culture" and that the prosecutor prevented her from being on the jury for that reason.  But, again, he provides no support for any such assertion.  Chu fails to show that the prosecutor's use of a peremptory challenge was racially-motivated,[6] or that a motion challenging it as such would have been successful.

Chu further alleges that trial counsel was ineffective for failing to investigate whether Chong and Gary may have killed Lo in "self-defense" during a "botched attempt to intimidate

---

[5]     *See Batson v. Kentucky*, 476 U.S. 79 (1986) (a shorthand reference to the procedure under which a prosecutor's peremptory strikes of potential jurors are challenged on the basis that the strikes are being made on a discriminatory basis, i.e., because they are members of an identifiable group distinguished on racial, religious, ethnic, or similar grounds).

[6]     The record reflects that the voir dire of that juror focused on her statements that she believed she would be traumatized by graphic evidence that might be shown at trial.

him for insulting the family clan."  But yet again, Chu proffers no evidence supporting such a theory.

Moreover, because Chu fails to show that trial counsel rendered ineffective assistance, he fails to show that appellate counsel was ineffective for failing to raise those claims on direct appeal.  In sum, Chu is not entitled to relief on any argument challenging the performance of either trial or appellate counsel.

3.      Restitution Claim (Ground 6)

Finally, Chu claims that the trial court erred in imposing a restitution fine without first considering his ability to pay.  This Court, however, does not have jurisdiction over a challenge to a restitution order imposed in state court.  A petition for a writ of habeas corpus can be entertained only on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  The Ninth Circuit has held that "§ 2254(a) does not confer jurisdiction over a habeas corpus petition raising an in-custody challenge to a restitution order."  *Bailey v. Hill*, 599 F.3d 976, 984 (9th Cir. 2010) (footnote omitted).  "[T]he remedy that [Petitioner] seeks, the elimination or alteration of a money judgment, does not directly impact—and is not directed at the source of the restraint on—his liberty."  *Id*. at 981.  A federal court, then, lacks jurisdiction to hear claims that challenge the money portion of a state judgment, such as a restitution order, which does not affect the duration of custody.  *Id.*

## V. CONCLUSION AND ORDER

Chu is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

24

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*, 537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: June 4, 2020.

>    /s/James K. Singleton, Jr.   
> JAMES K. SINGLETON, JR.
> Senior United States District Judge